# PART  1

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

CHARLES W. SMITH, Individually and On )
Behalf Of All Others Similarly Situated, )
                                        )
        Plaintiff, )     Case No.
                                          )
v. )
                                          )     **JURY TRIAL DEMANDED**
XYBERNAUT CORPORATION, EDWARD )
G. NEWMAN, STEVEN A NEWMAN, )
THOMAS D. DAVIS, BRUCE C. HAYDEN, )
and GRANT THORNTON LLP, )
                                          )
        Defendants. )
                                          )

## CLASS ACTION COMPLAINT FOR
## VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Plaintiff has alleged the following based upon the investigation of Plaintiff's counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings by Xybernaut Corporation ("Xybernaut" or the "Company"), as well as regulatory filings and reports, securities analysts reports and advisories about the Company, press releases, and media reports about the Company, and Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

### NATURE OF THE ACTION AND SUMMARY OF ALLEGATIONS

1.     This is a class action on behalf of all persons and entities who purchased or otherwise acquired the securities of Xybernaut between May 10, 2002 and April 8, 2005, inclusive, and who were damaged thereby, seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.      Xybernaut is engaged in the research, development, manufacture, marketing and sales of mobile, wearable computing and communication systems, and software and service solutions to enhance product management, asset management, and the accuracy, timeliness and utilization of captured data. The Company's flagship products include Atigo wireless displays, which are computerized units which provide remote and mobile service representatives with wireless and just-in-time access to product and customer data, and Mobile Assistant ® wearable computers, which provide the power and functionality of a desktop computer in remote, rugged and space-constrained settings.

3.      During the Class Period, Xybernaut reported quarter after quarter of positive results in press releases and filings with the SEC. The Company attributed the results to, among other things, the sale of its handheld and wearable computer devices, as well as cost-cutting programs, financings, intellectual property licensing strategies, strategic partnerships and securing key accounts in the transportation, retail, military and homeland security sectors. For example, in a press release announcing the Company's fourth quarter and full-year 2003 results, defendant Edward G. Newman, Chief Executive Officer and Chairman of Xybernaut, stated, "Management firmly believes that the *best is yet to come* and *we expect to extend the positive momentum* the Company is currently experiencing." (emphasis added). In reaction to defendants' statements, the price of Xybernaut stock traded as high as $2.56 per share during the Class Period (on September 18, 2003). Unbeknownst to the Class, these statements were materially false and misleading because defendants failed to disclose that the Company's purported success was the result of, in material part, improper accounting, made possible by a serious breakdown in the Company's internal controls.

4.     The truth began to emerge on February 17, 2005. On that day, after weeks of decline in the price of Xybernaut stock, the Company issued a press release stating "that it knows of no business reason or financial condition that would explain the decline in its stock price." In reaction to this announcement, the price of Xybernaut stock closed higher at $0.92 per share, up $0.07 from its closing price on February 16, 2005.

5.     On March 14, 2005, Xybernaut issued a press release announcing that it would be unable to file its 2004 annual report on time. The Company stated that it expected to file its annual report by March 31, 2005. In reaction to this news, the price of Xybernaut stock fell $0.12 from its closing price of $0.72 on March 11, 2005, the previous trading day, to close at $0.60 on March 14, 2005.

6.     On March 31, 2005, after the market closed, defendants issued a press release revealing that it had discovered material weaknesses in Xybernaut's internal controls with respect to expense reimbursement, revenue recognition, and the monitoring of business risks. The Company stated that it had engaged independent legal counsel to conduct an internal investigation of these matters. The Company stated that as a result of the investigation, it could not predict when it would be able to file its 2004 annual report with the SEC, and cautioned that the delayed filing would prevent the Company from registering additional shares of stock. In addition, the Company revealed for the first time that, on February 1, 2005, *nearly two months earlier,* it had received a subpoena from the SEC seeking documents relating to the sale of securities by an unidentified shareholder. Xybernaut also announced that it had received notification from Nasdaq that the Company's stock, which had been trading below $1.00 per share, was subject to delisting.

In reaction to this news, the price of Xybernaut dropped another $0.18 per share from its closing price of $0.42 on March 31, 2005, to close at $0.24 on April 1, 2005.

7.    On April 8, 2005, the last day of the Class Period, defendants disclosed that the Company had received a letter from its auditor, Grant Thornton LLP, questioning the accuracy and reliability of the Company's accounting and related disclosures; the Company's historical financial statements for fiscal 2002 and 2003; and the Company's financial statements for the interim first, second, and third quarters of 2002 and 2003. In reaction to this news, the price of Xybernaut stock, which had already fallen $0.53 per share since the Company's March 14, 2005 announcement that it would not be able to timely file its annual report, fell another $0.06 to close at $0.13 on the next trading day, April 11, 2005.

8.    On April 19, 2005, after the market had closed, the Company announced the completion of its internal investigation. Despite the report's lack of specificity, it made clear that the Company's management had engaged in serious undisclosed wrongdoing that had a material impact on the Company's financial condition and performance, and which rendered all statements by defendants suspect. In pertinent part, the report determined:

1.    The Company's Chairman and CEO, Edward G. Newman, improperly used substantial Company funds for personal expenses and failed to properly substantiate expenses charged to the Company.

2.    Newman's family members were hired and evaluated/not evaluated in direct violation of the Company's anti-nepotism policy and constituted a "protected class" of employees.

3.    The employment of Newman's family members had not been disclosed in SEC filings as required by SEC disclosure regulations.

4.    The Company had failed to adhere to effective disclosure controls governing the Company's public disclosures and the issuance of press releases.

4

5.    Senior Management had entered into major transactions in violation of Company internal controls and concealed material financial conditions of the transactions to the Board.

6.    Certain members of senior management failed to disclose to the Audit Committee and the Board written correspondence by the Company's former Chief Financial Officer outlining serious concerns over the breakdown of internal controls; and

7.    Edward G. Newman and Steven A. Newman affirmatively impeded the Audit Committee's investigation in material respects.

The Company stated that it had removed, or had requested the resignation of, the officers and directors identified above. Moreover, the Company stated that Grant & Thornton had resigned as auditor because "in its professional judgment, it can no longer rely on management's representations." The Company repeated its warnings that "no reliance should be placed upon certain of the Company's historical financial statements, together with the related audit reports the Company received from its outside auditors."

9.    On April 25, 2005, Xybernaut announced that the United States Attorneys Office for the Eastern District of Virginia had commenced an investigation of the Company relating to the wrongdoing discovered in the Company's internal investigation. In addition, Xybernaut stated that "it continues to face a severe liquidity crisis and possible insolvency" and that there "can be no assurances that the Company will have sufficient cash to meet its financial obligations or fund continuing operations."

10.    On May 12, 2005, the Company announced that it received notification from the Nasdaq Stock Market that it's shares were delisted, effective with the opening of the market on May 12, 2005.

## JURISDICTION AND VENUE

11.    The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§ 78j(b) and 78t(a)], and Rule 10b-5 promulgated thereunder by the SEC [17 C.F.R. § 240.10b-5].

12.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337 and Section 27 of the Exchange Act [15 U.S.C. § 78aa].

13.    Venue is proper in this District pursuant to Section 27 of the Exchange Act, and 28 U.S.C. § 1391(b). Many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District. In addition, Xybernaut is incorporated in this District and maintains a registered office or agent in this District.

14.    In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the Nasdaq.

## PARTIES

15.    Plaintiff Charles W. Smith purchased Xybernaut common stock during the Class Period, as set forth in his certification, annexed hereto, and suffered an economic loss as a direct result of defendants' fraudulent conduct as alleged herein.

16.    Defendant Xybernaut is a Delaware corporation, and maintains its corporate headquarters at 12701 Fair Lakes Circle, Suite 550, Fairfax, Virginia 22033.

17.    Defendant Edward G. Newman ("E. Newman") was, at all relevant times, Chief Executive Officer and Chairman of the Board of the Company.

18.    Defendant Thomas D. Davis ("Davis") was Chief Financial Officer and Senior Vice President of the Company from November 2002 to November 7, 2004.

19.    Defendant Steven A. Newman ("S. Newman") was, at all relevant times, President, Chief Operating Officer and Vice Chairman of the Company.

20.    Defendant Bruce C. Hayden ("Hayden") was Chief Financial Officer and Senior Vice President of the Company from November 8, 2004 to present.

21.    Defendants E. Newman, A. Newman, Davis, and Hayden are collectively referred to herein as the "Individual Defendants."

22.    Defendant Grant Thornton LLP ("Grant Thornton") is a worldwide firm of certified public accountants that provides tax, assurance and advisory services. Grant Thornton is a member firm of Grant Thornton International, one of the six international accounting, tax and business advisory organizations. At all relevant times, Grant Thornton served as the Company's auditor until its resignation on, or about, April 14, 2005. Grant Thornton maintains its principal executive office in the United States at 175 West Jackson Boulevard, Chicago, Illinois 60604, and the office located at 2070 Chain Ridge Road, Suite 300, Vienna, Virginia 22182, oversaw the audits at issue in this case.

23.    Because of the Individual Defendants' positions with the Company, they had access to the adverse undisclosed information about its business, operations, products, operational trends, financial statements, markets and present and future business prospects via access to internal corporate documents (including the Company's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at

7

management and Board of Directors meetings and committees thereof and via reports and other information provided to them in connection therewith.

24.    It is appropriate to treat the Individual Defendants as a group for pleading purposes and to presume that the false, misleading and incomplete information conveyed in the Company's public filings, press releases and other publications as alleged herein are the collective actions of the narrowly defined group of defendants identified above. Each of the above officers of Xybernaut, by virtue of their high-level positions with the Company, directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its business, operations, products, growth, financial statements, and financial condition, as alleged herein. Said defendants were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, were aware or recklessly disregarded, that the false and misleading statements were being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

25.    As officers and controlling persons of a publicly-held company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, traded on the Nasdaq during the Class Period, and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to disseminate promptly, accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings and present and future business prospects, and to correct any

previously-issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly-traded securities would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

26.    The Individual Defendants participated in the drafting, preparation, and/or approval of the various public reports and other communications complained of herein and were aware of, or recklessly disregarded, the misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature. Because of their Board membership and/or executive and managerial positions with Xybernaut, each of the Individual Defendants had access to the adverse undisclosed information about Xybernaut's business prospects and financial condition and performance as particularized herein and knew (or recklessly disregarded) that these adverse facts rendered the positive representations made by or about Xybernaut and its business issued or adopted by the Company materially false and misleading.

27.    The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the Class Period. Each Individual Defendant was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Accordingly, each of the Individual Defendants is responsible for the accuracy of the public reports and releases detailed herein and is therefore primarily liable for the representations contained therein.

9

28.      Each of the defendants is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Xybernaut common stock by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme: (i) deceived the investing public regarding Xybernaut's business, finances, financial statements and the intrinsic value of Xybernaut common stock; and (ii) caused Plaintiff and other members of the Class to purchase Xybernaut securities at artificially inflated prices.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

29.      Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired the securities of Xybernaut between May 10, 2002 and April 8, 2005, inclusive, and who were damaged thereby. Excluded from the Class are defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

30.      The members of the Class are so numerous that joinder of all members is impracticable. During the Class Period, there were approximately 179 million shares of Xybernaut common stock outstanding that were actively traded on the Nasdaq. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Xybernaut or its transfer agent and

may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

33.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

32.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

33.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

1.    whether the federal securities laws were violated by defendants' acts as alleged herein;

2.    whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations and financial statements of Xybernaut; and

3.    to what extent the members of the Class have sustained damages and the proper measure of damages.

34.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class

11

to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

### Materially False and Misleading
### Statements Made During The Class Period

35.    On May 9, 2002, after the market closed, Xybernaut issued a press release in which it announced its first quarter 2002 results. In the release, the Company reported "the highest first quarter results in the Company's history," stating, in relevant part, as follows:

> FAIRFAX, Va.--(BUSINESS WIRE)--May 9, 2002--Xybernaut Corporation (Nasdaq:XYBR) today announced quarterly revenues of $2.8 million for its first quarter ended March 31, 2002, the highest first quarter results in the Company's history.
>
> This represents a 24% increase compared with $2.3 million for the corresponding period a year ago.
>
> Hardware revenue for the quarter was $1.8 million, an increase of 38% from $1.3 million for the same period in the prior year. The net loss applicable to holders of common stock for the first quarter was $8.0 million, or $0.13 per share, compared with $5.9 million, also $0.13 per share, for the same period in the prior year.
>
> Results for the first quarter are consistent with the guidance previously given.

Defendant Edward G. Newman commented on the purportedly strong results as follows, in relevant part:

> "We are now beginning to see tangible results from the investments we have made in developing our technology platforms and our efforts to cultivate strategic vertical industry sectors," said Edward G. Newman, chairman, president and CEO for Xybernaut. "We have realized considerable success in various metrics that we consider key indicators of strong revenue growth. In addition, our restructuring activities are progressing well and we expect to achieve the savings outlined in our earlier announcement."

In addition, the Company reported the following:

Enterprise customers are moving into broader deployments of Xybernaut solutions. Through the end of the first quarter 2002, the Company has sold more than 3,500 units of the Mobile Assistant series and realized over $17 million in revenues from those sales.

Xybernaut continues to expand Team Xybernaut(SM), its community of value-added resellers (VARs) and systems integrators. As of the end of the first quarter of 2001, less than 20 companies were participating in Team Xybernaut. Comparatively, during the first quarter of 2002 alone Xybernaut completed more than 20 Team Xybernaut agreements bringing the number of completed Team Xybernaut agreements to more than 95 since the program's inception.

Guidance

The Company is increasing quarterly revenue guidance for the remainder of this year to 30% to 60% increases in revenue from the same quarters in the prior year.

This guidance is up from the 25% to 50% quarterly increase previously provided. This guidance range indicates expected revenues of $2.6 million to $3.2 million for the second quarter ending June 30, 2002.

36.    On May 15, 2002, the Company filed its first quarter 2002 report with the SEC on a Form 10-Q, reiterating the results it had announced in the May 9, 2002 press release.

37.    On July 11, 2002, the Company issued a press release announcing that it had raised more than $5 million in equity capital through a $4 million private placement of common stock with institutional investors and the exercise of approximately $1 million of warrants.

38.    On August 13, 2002, the Company issued a press release announcing its second quarter 2002 results. In the release, the Company stated as follows, in relevant part:

FAIRFAX, Va., Aug 13, 2002 (BUSINESS WIRE) -- Xybernaut(R) Corporation (Nasdaq: XYBR) today announced quarterly revenues of $2.0 million for its second quarter ended June 30, 2002, or approximately the same as revenues for the second quarter a year ago, and consistent with prior revised guidance. The net loss for the second quarter was $6.7 million,

or $0.10 per share, compared with $8.5 million, or $0.17 per share, for the same period in the prior year.

Hardware revenue for the quarter was $1.2 million, an increase of 102% from $0.6 million for the same period in the prior year.

Operating expenses for the second quarter were $6.9 million, not including restructuring charges, a reduction of 21% from $8.7 million in the first quarter ending March 31, 2002 and a reduction of 31% from $10.1 million in the fourth quarter ending December 31, 2001.

Revenue for the six months ended June 30, 2002 was $4.8 million, representing an increase of 12% versus revenue of $4.3 million for the same period a year ago. The Company reported a net loss of $14.7 million for the first six months of 2002, or $0.23 per share, versus a loss of $14.4 million, or $0.30 per share, for the first six months of 2001.

"We are now beginning to see tangible results from the restructuring actions initiated earlier this year. These actions have included reductions in workforce, reductions in overseas operations and salary reductions for top executives ranging from 20-25%," said Edward G. Newman, chairman, president and CEO for Xybernaut. "With these cost reductions and expected revenue increases, we look forward to achieving our target of profitability in 2003," Newman added.

Revenue Guidance

The Company reaffirmed revenue guidance for the third and fourth quarters of 2002 at a 30 to 60% increase from the equivalent quarters in the prior year; however, the Company also noted that the timing of orders and shipment of product could affect the timing of revenue realized in each of those quarters.

39.    On the same day, August 13, 2002, the Company filed its second quarter 2002 report with the SEC on a Form 10-Q, reiterating its previously announced results.

40.    On November 14, 2002, Xybernaut issued a press release announcing its third quarter 2002 results. The release stated, in relevant part, as follows:

FAIRFAX, Va.--(BUSINESS WIRE)--Nov. 14, 2002--Xybernaut(R) Corporation (Nasdaq:XYBR) today announced quarterly revenues of $2.5 million for its third quarter ended September 30, 2002. This represents an increase of approximately 26% from revenues during the preceding second quarter of 2002 and an increase of approximately 10% over revenues during the comparable third quarter of 2001. The net loss for the third quarter was

14

$7.9 million, or $0.10 per share, compared with $8.1 million, or $0.15 per share, for the same period in the prior year.

Operating expenses, excluding restructuring and other non-recurring charges, for the third quarter of 2002 were $6.0 million, a reduction of 41% from the fourth quarter of 2001 and 14% from the preceding second quarter of 2002.

Revenue for the nine months ended September 30, 2002 was $7.4 million, representing an increase of 11% versus revenue of $6.6 million for the same period a year ago. The Company reported net losses of $22.5 million for both the first nine months of 2002 and 2001.

"Throughout 2002, Xybernaut has successfully introduced new product lines, gained traction in critical industry segments, extended the Team Xybernaut(TM) partner community, strengthened our intellectual property position and demonstrated our ability to raise capital despite difficult market conditions," stated Edward G. Newman, chairman, president and CEO.

"We continue our drive to profitability and see significant benefits from the restructuring and cost cutting initiatives we have undertaken throughout 2002," continued Newman. "We expect to reduce our operating expenses by 50% over prior levels. We have significantly reduced our headcount, restructured agreements with vendors and partners, reduced inventory commitments and implemented various other cost saving strategies such as consolidating international operations. To build upon these successful efforts, I am pleased to announce management changes within Xybernaut."

* * *

Revenue Guidance

The Company's previous guidance for revenues in the fourth quarter of 2002 remains unchanged; however, the Company also noted that the timing of orders and shipment of product could affect the timing of revenue realized in that period.

41.     On the same day, November 14, 2002, the Company filed its third quarter 2002 report with the SEC on a Form 10-Q, reiterating its previously announced results.

42.     On March 27, 2003, Xybernaut issued a press release announcing its fourth quarter and full-year 2002 results. In the release, the Company reported a 2% increase in

revenues compared to the same period in 2001 and a 17% increase in hardware revenues,

stating in relevant part, as follows:

> FAIRFAX, Va., Mar 27, 2003 (BUSINESS WIRE) – Xybernaut(R) Corporation (NASDAQ: XYBR) today announced the results of its operations for the fourth quarter and full year 2002.
>
> Total revenues for 2002 were $10.0 million, a 2% increase over 2001. These results include a 17% increase in 2002 hardware revenues to $6.1 million. Total revenues for the fourth quarter ended December 31, 2002 were $2.6 million, representing an increase of approximately 2% over revenues during the third quarter of 2002.
>
> Net operating expenses for the fourth quarter of 2002 were $4.5 million, a reduction of 56% from the fourth quarter of 2001 and 26% from the third quarter of 2002. Net operating expenses exclude restructuring and certain other non-recurring charges and are discussed in further detail below. Net loss for 2002 decreased 17% from $32.2 million, or $0.63 per share, for 2001 to $26.6 million, or $0.37 per share, for 2002.
>
> "Xybernaut continues to achieve considerable success despite challenging market conditions," stated Edward G. Newman, chairman, president and CEO. "We recently launched the third product in the successful Atigo(TM) family of mobile computers. We continue to strengthen our intellectual property, as evidenced through recent announcements of patent grants and an aggressive new licensing strategy. We have reorganized our management structure and strengthened our corporate governance through the appointment of two new independent directors to our board. Furthermore, we are amongst a small number of technology companies actually deploying comprehensive solutions into first responder and homeland security communities," added Newman.
>
> "I am very pleased to announce that Xybernaut has surpassed our previously stated targets related to reductions in operating expenses, as evidenced by the 56% decline in net operating expenses for the fourth quarter of 2002 over the comparable 2001 period," stated Tom Davis, senior vice president and CFO. "Additionally, we have recently been successful in eliminating a considerable amount of long-term liabilities and commitments relating to both product and inventory."

43.    On March 28, 2003, Xybernaut filed its 2002 annual report with the SEC on a

Form 10-K, reiterating its previously announced results in the March 27, 2003 press

release.

44.    On April 2, 2003, the Company announced that it had raised $6.1 million from the completion of a $2.0 million private placement of common stock with institutional investors, a long-term borrowing of $1.75 million and the exercise of approximately $2.4 million of warrants. In reaction to this news, the price of Xybernaut stock rose $0.04 per share from its previous day's closing price of $0.38, to close at $0.42 on April 2, 2003.

45.    On June 19, 2003, the Company issued a press release announcing that it had raised another $7.75 million through private placements of Xybernaut common stock and the exercise of warrants.

46.    On August 11, 2003, the Company issued a press release announcing its second quarter 2003 results. The Company stated, in relevant part, as follows:

> FAIRFAX, Va., Aug 11, 2003 (BUSINESS WIRE) -- Xybernaut(R) Corporation (NASDAQ:XYBR) today announced that total revenue for the second quarter of 2003 (three months ended June 30) was $2.8 million, a 56% increase from the preceding first quarter of 2003, and a 38% increase from the comparable period in 2002.
>
> As of June 30, the Company had no long-term debt, a stockholders' equity balance of over $11 million and more than $5 million of cash on-hand. Subsequent to June 30, the Company also reported that it had raised an additional $3 million through warrant exercises.
>
> Hardware revenue for the second quarter of 2003 was $1.8 million, a 115% increase from the first quarter of 2003 and a 53% increase from the second quarter of 2002.
>
> Gross margin from hardware sales increased to 33% for the three months ended June 30, 2003 as compared with 12% for the three months ended June 30, 2002. Margin for consulting and other sales increased to 38% in the second quarter of 2003 versus 34% in the second quarter of 2002.
>
> The net loss for the second quarter of 2003 decreased over 50% to $3.3 million from the second quarter of 2002. The net loss per share also decreased to $0.02 per share from $0.10 per share in the prior year.
>
> "The Company is moving in the right direction in virtually all areas. We are pleased with our second quarter results and especially the record revenue

levels that we achieved. We are determined to do even better on all fronts as we move forward and my outlook remains highly positive," stated Steven A. Newman, Xybernaut president.

Thomas D. Davis, senior vice president and CFO, added, "We have continued our cost cutting efforts into 2003, streamlined operations and, with significant cash on-hand we now believe that we have more than enough capital to last us through the end of the year."

"From recent meetings with executives of some of the world's largest companies, I've seen first hand that these business leaders recognize that wearable computing has moved from a possible to a preferred mobile computing solution," stated Edward G. Newman, chairman and CEO. "Our primary objective is to steadily increase stakeholder value by leveraging these relationships and others as well as our expertise and successes to produce tangible results."

47.    On August 13, 2003, the Company filed its second quarter 2003 report with the SEC on a Form 10-Q which reiterated the results announced in the August 11, 2003 press release.

48.    On September 10, 2003, the Company issued a press release announcing that it had been awarded a contract worth $1.62 million by the U.S. Department of Defense to provide wearable computing technologies and solutions for U.S. military aircraft and defense maintenance systems. Defendant E. Newman touted the award of the defense contract, stating as follows:

"We are clearly proving that we have the desired mix of products, professional services and industry expertise to successfully compete for and win large contract awards from the U.S. military," stated Edward G. Newman, chairman and chief executive officer of Xybernaut. "Our years of effort invested in cultivating opportunities in this sector are yielding tangible, quantifiable results and demonstrate that Xybernaut is indeed being viewed as the preferred solution provider of wearable/computing solutions for our military forces."

In addition, defendant S. Newman stated as follows:

"Xybernaut continues to execute key growth strategies to develop scalable, replicable mobile/wearable computing solutions that anticipate our customers'

needs and deliver full function computing power where and when it is needed," said Steven A. Newman, Xybernaut president. "Xybernaut is meeting the unique and sophisticated demands of the U.S. military and fully expects that this relationship will drive dynamic revenue growth for our Company on an on-going basis."

In reaction to this news, the price of Xybernaut stock traded as high as $1.40 per share on volume of over 25 million on September 10, 2003 before closing at $1.25.

49.    On September 29, 2003, the Company announced the completion of another private placement of Xybernaut common stock for proceeds of approximately $7 million. In addition, the Company stated that it had received notification from Nasdaq that it was in full compliance with Nasdaq continued listing requirements. Defendants Davis and E. Newman commented on the purported success of the financing as follows:

> "These financings were executed with favorable terms and help us achieve what I consider to be the Company's strongest financial position since the initial public offering," stated Thomas D. Davis, Xybernaut CFO. "We have a strong cash position, maintain no debt and continue to keep our operating expenses at a low level."

> "We've seen positive results in recent quarters from our sales, marketing and business development efforts; we've introduced new and innovative products; we've secured important patents while aggressively protecting our intellectual property; and we are involved in numerous business ventures with key partners," said Edward G. Newman, Xybernaut chairman and CEO. "By taking advantage of this opportunity to strengthen our capital structure, Xybernaut is in a better position than ever to extend our recent positive momentum and continue to deliver the results that our customers and stakeholders deserve."

50.    On November 13, 2003, Xybernaut issued a press release announcing its third quarter 2003 results, including a 6%, or $2.7 million, increase in revenues compared to the same period in 2002. In the release, the Company stated, in relevant part, as follows:

> FAIRFAX, Va., Nov 13, 2003 (BUSINESS WIRE) -- Xybernaut(R) Corporation (NASDAQ:XYBR) today announced that total revenue for the third

quarter of 2003 (three months ended September 30) was $2.7 million, a 6% increase from the same period in 2002. These results represent the second highest levels of both U.S. revenues as well as worldwide consulting revenues in the Company's history.

Net operating expenses for the three months ended September 30, 2003 declined for the seventh consecutive quarter to $3.8 million. This represents a reduction of over 62% from the fourth quarter of 2001 and a 36% reduction from the third quarter of 2002.

The term "net operating expense" is discussed and reconciled in the "Non-GAAP Financial Measure" section of this press release.

At September 30, the Company had no long-term debt, record quarter-end cash of over $13 million and record stockholders' equity of over $17 million.

The net loss for the third quarter of 2003 decreased 41% to $4.7 million from the third quarter of 2002. The net loss per share also decreased to $0.03 per share from $0.10 per share in the prior year.

Defendant Davis commented on purportedly strong results, stating "Our future has never looked brighter." In addition, Davis stated as follows, in relevant part:

Thomas D. Davis, CFO, noted, "Our cash and stockholders equity balances are both at record levels, we have no long term debt and we have successfully cut costs for seven consecutive quarters. I continue to believe that we have the strongest financial position since our IPO."

"Perhaps one of the best measures of our success is our ability to replicate customer wins in strategic markets," stated Steven A. Newman, president of Xybernaut. "For example, since the Company's inception, we have secured hardware and services contracts in the transportation sector, alone, surpassing more than $10 million. This focused approach is also producing similar strong results in many other targeted industries. Our future has never looked brighter."

51.    On the same day, November 13, 2003, the Company filed its third quarter 2003 report with the SEC on a Form 10-Q, reiterating the results it had announced in the press release issued on the same day.

52.    On March 9, 2004, the Company issued a press release announcing "record"

results for the fourth quarter and full-year 2004. In the release, the Company stated, in

relevant part, as follows:

> The Company recorded its highest quarterly revenue ever during the fourth
> quarter of 2003. Revenue for the quarter ended December 31, 2003 was
> $3.7 million, a 43% increase over the fourth quarter of 2002 and a 38%
> increase over the third quarter of 2003. Total revenue for the full year 2003
> increased 10% to $11.0 million, compared to $10.0 million for 2002. These
> year-end results include the highest levels of both product and consulting
> services revenues in the Company's history.
>
> The Company's net loss for the fourth quarter of 2003 was $5.3 million
> compared to a loss of $4.0 million in the comparable quarter of the prior year.
> The net loss for the entire year ended December 31, 2003 was $18.6 million
> compared to a loss of $26.6 million for 2002.
>
> At December 31, 2003, the Company had no long-term debt, cash of $9.5
> million and stockholders' equity of $15.9 million.
>
> "The management and staff at Xybernaut have never been more focused,"
> said Edward G. Newman, chairman and CEO of Xybernaut. "From record
> revenues, no debt and strong financial fundamentals; to growing demand
> from existing and new customers; to recent international successes, we are
> achieving on every level. Building on these achievements, management
> continues to be optimistic and encouraged by the prospects for 2004 and
> beyond."

53.    On March 12, 2004, the Company filed its 2003 annual report on a Form 10-K

with the SEC, reiterating the results it had announced in the March 9, 2004 press release.

54.    On May 4, 2004, Xybernaut issued a press release announcing its first

quarter 2004 results, reporting a 146% increase in total revenue from the same period in

2003. In the release, the Company stated, in relevant part, as follows:

> FAIRFAX, Va.--(BUSINESS WIRE)--May 4, 2004--Xybernaut(R) Corporation
> (NASDAQ:XYBR) today announced that total revenue for the first quarter
> ended March 31, 2004 was $4.4 million, a 146% increase over the
> comparable 2003 period. Hardware revenue for the first quarter of 2004
> totaled $2.9 million, increasing 256% from the first quarter of 2003.

21

This represents the Company's second consecutive quarter of record revenue. Last quarter, the period ended December 31, 2003, the Company reported revenue of $3.7 million, a 43% increase in revenue over the fourth quarter of 2002.

As of the end of the first quarter 2004, the Company had no long-term debt, cash of $12.5 million and record stockholders' equity of $18.3 million.

"We are pleased to announce back-to-back quarters with record revenue and strong year-to-year revenue growth," said Edward G. Newman, chairman and CEO of Xybernaut. "This strong momentum helps validate our belief that the more widespread adoption of wearable/mobile technologies is happening now. Our products and solutions are being deployed today and they are being deployed in record numbers. With low expenses and our losses decreasing, I continue to remain optimistic and positive about our prospects for the remainder of 2004 and thereafter," continued Newman.

55.    On May 7, 2004, the Company filed its 2003 annual report with the SEC on a

Form 10-K, reiterating the results it had announced in the May 4, 2004 press release.

56.    On August 5, 2004, Xybernaut issued a press release announcing its second

quarter 2004 results, reporting a 21%, or $3.4 million, increase in total revenue from the

same period in 2003. In the release, the Company stated, in relevant part, as follows:

FAIRFAX, Va.–(BUSINESS WIRE)--Aug. 5, 2004--Xybernaut(R) Corporation (NASDAQ:XYBR) today announced results for its second quarter ended June 30, 2004. Total revenue for the second quarter of 2004 was $3.4 million, a 21% increase from the comparable 2003 period. Total revenue for the six months ended June 30, 2004 was $7.8 million, a 70% increase from the six months ended June 30, 2003. Beginning with the fourth quarter of 2003 and continuing through the second quarter of 2004, the Company has now reported its highest three quarterly revenues ever.

The Company also reported a strong balance sheet. As of June 30, 2004, the Company had no long-term debt, cash of $13.3 million and stockholders' equity of $16.5 million.

Defendant E. Newman touted the Company's results as follows:

"With revenues up 70%, the value of our intellectual property now being validated and having just come off the Company's strongest three quarters ever, I am confident that we are not only on the right track but also that our growth in many areas will now be sharply accelerating as we move forward,"

said Edward G. Newman, chairman and CEO of Xybernaut.

"Xybernaut solutions and technologies based on our intellectual property are now being deployed into a wide variety of major market sectors from homeland security applications used to examine moving cargo containers; to systems that can detect guns; to in-the-field monitoring solutions to combat West Nile virus; to information delivery systems used by Wall Street traders; to even a solution that will allow a disabled child to learn to communicate," Newman added.

57.    On August 6, 2004, the Company filed its second quarter 2004 report with the

SEC on a Form 10-Q, reiterating the results it had announced in the August 5, 2004 press

release.

58.    On November 9, 2004, the Company issued a press release announcing its

third quarter 2004 results and reporting another increase in total revenue, as follows:

FAIRFAX, Va., Nov 9, 2004 (BUSINESS WIRE) -- Xybernaut(R) Corporation (NASDAQ:XYBR) today announced results for its third quarter ended September 30, 2004. Total revenue for the third quarter of 2004 was $3.2 million, a 20% increase from the comparable 2003 period. Total revenue for the nine months ended September 30, 2004 was $11.0 million, a 51% increase from the nine months ended September 30, 2003.

Other financial highlights for the three months ended September 30, 2004 include:

-- Licensing revenue from the non-exclusive grant of one of the Company's "Dual-Use Flat Panel Display" patents;-- Shipments of Atigo T systems to Tesco pursuant to the Company's recently announced $9 million order; and -- Beginning with the fourth quarter of 2003 and continuing through the third quarter of 2004, the Company has now reported its highest four quarterly revenues ever.

Defendant E. Newman claimed that the Company was experiencing "top-line growth,"

stating, as follows:

"We are well on our way to our most successful year ever. In fact, our total nine-month revenues have already surpassed our previous 12-month high," stated Edward G. Newman, chairman and CEO of Xybernaut. "This top-line growth is the direct result of our continued and successful efforts to bring in new and larger customers while still maintaining our focus on existing

23

partners. With our recently announced management team and enhanced corporate governance initiatives in place, I firmly believe that we are poised to continue to deliver positive results through the rest of 2004, 2005 and beyond."

59.     On the same day, November 9, 2004, the Company filed its third quarter 2004 report with the SEC on a Form 10-Q, reiterating the results announced in the press release issued on the same day.

60.     On December 16, 2004, the Company issued a press release about its annual shareholder meeting. In the release, defendant S. Newman stated that "2004 continues to be a banner year for the company as we anticipate continued success moving forward. Our efforts remain focused on enhancing both near and long-term shareholder value."

61.     The statements referenced above in ¶¶ 35-60 were materially false and misleading and known or recklessly disregarded as such by defendants because they failed to disclose the following facts, among others:

1.     the Company's accounting and related disclosures in its financial statements during the Class Period were inadequate, improper, and inherently unreliable as evidenced by, among other things, the Company's auditor's public declaration that "it can no longer rely on management's representations";

2.     defendant Edward G. Newman misappropriated Company funds for personal expenses;

3.     the SEC had commenced an investigation of the Company relating to the sale of Xybernaut securities by a shareholder; and

4.     the Company lacked adequate internal controls.

24

## THE TRUTH BEGINS TO EMERGE

62.     The truth began to emerge on February 17, 2005. On that day, after weeks of decline in the price of the Company's stock, Xybernaut issued a press release responding to shareholder inquiries, stating "that it knows of no business reason or financial condition that would explain the decline in its stock price."

63.     On March 14, 2005, Xybernaut issued a press release announcing that it had sought, and was granted, an extension to file its 2004 annual report with the SEC. The Company stated that it intended to file its annual report by March 31, 2005. In reaction to this news, the price of Xybernaut stock fell another $0.12 from its closing price of $0.72 on March 11, 2005, the previous trading day, to close at $0.60 on March 14, 2005.

64.     The statements referenced above in ¶¶ 62 and 63 were materially false and misleading and known or recklessly disregarded as such by defendants for the reasons set forth in ¶ 61.

65.     On March 31, 2005, after the market closed, defendants issued a press release revealing that they had discovered material weaknesses in Xybernaut's internal controls with respect to expense reimbursement, revenue recognition, and the monitoring of business risks. Defendants stated that the Company had engaged independent legal counsel to conduct an internal investigation of these matters. Moreover, defendants stated that as a result of the investigation, the Company could not predict when it would be able to file its 2004 annual report with the SEC, and cautioned that the delayed filing would prevent the Company from registering additional shares of stock. In addition, the Defendants revealed for the first time that, on February 1, 2005, *virtually two months earlier,* it had

received a subpoena from the SEC relating to the sale of securities by an unidentified

shareholder. Xybernaut also announced that it had received notification from Nasdaq that

the Company's stock, which had been trading below $1.00 per share, was subject to

delisting. The Company stated, as follows:

> FAIRFAX, Va., Mar 31, 2005 (BUSINESS WIRE) -- Xybernaut Corporation (NASDAQ:XYBR) announced today that the filing of its Form 10-K and other related reports for the year ended December 31, 2004, anticipated to occur today, will be further delayed, pending completion of an internal investigation undertaken by its Audit Committee.
>
> On February 28th, the Audit Committee engaged independent counsel - Alston & Bird LLP - to assist it in conducting an internal investigation of, among other things, concerns brought to the Audit Committee's attention relating to the internal control environment of the Company, the propriety of certain expenditures and the documentation of certain expenses of the Chairman and CEO of the Company, the Company's transparency and public disclosure process, the accuracy of certain public disclosures, management's conduct in response to the investigation, and the propriety of certain major transactions. The Audit Committee's investigation is continuing, and the filing of the Company's 10-K will await the conclusions of that investigation. At this time, the Company is unable to predict when its 10-K will be filed.
>
> On February 1, 2005, the Company received a subpoena from the Northeast Regional Office of the Securities and Exchange Commission, seeking documents and other information relating to the sale of Company securities by any person identified as a selling shareholder in any Company registration statement or other public filing.
>
> As a result of the delayed filing of its Form 10-K, the Company will lose its status to file registration statements on form S-3, which has historically been utilized to expedite the registration of common stock issued in connection with the Company's financings. The loss of the right to use form S-3 could have a material impact on the ability of the Company to raise additional funds in the future, and therefore affect its ability to meet its obligations as they come due.
>
> Management is still in process of completing the Sarbanes-Oxley 404 internal control testing for the year ended December 31, 2004. However, certain material weaknesses currently have been identified related to the control environment and control activities as it relates to the Company's policies and procedures in the expense reimbursement process, revenue recognition related to certain product sales, and monitoring of business risks.

Management continues to evaluate the identified issues and is addressing remediation plans to be implemented.

Xybernaut also announced unaudited results for the year end December 31, 2004 in addition to 4th quarter results. Revenues for 2004 were approximately $13.9 million, with a net loss of approximately $19.7 million. Revenues for the 4th quarter were approximately $2.9 million, with a net loss of approximately $7.2 million. These unaudited results do not include possible further adjustments, including but not limited to, the matters discussed above.

On March 30, 2005 the Company received notice from the NASDAQ Stock Market that the bid price of the Company's common stock has closed below the minimum $1.00 per share requirement for the stock's continued listing under Marketplace Rule 4310(c)(4) (the "Rule"). Therefore, the Company has until September 26, 2005 to become compliant. If, at any time before September 26, 2005, the bid price of the Company's common stock closes at $1.00 per share or more for a minimum of 10 consecutive business days, the Company will comply with NASDAQ's listing requirements. If not, NASDAQ will determine whether the Company meets NASDAQ SmallCap Market initial listing criteria as set forth in Marketplace Rule 4310(c), except for the bid requirement. If the Company meets the initial listing criteria, the Company will be granted an additional 180 day compliance period. If the Company is not eligible for an additional compliance period, the Company's securities will be delisted. At that time, the Company can appeal NASDAQ's determination to delist its securities to a Listing Qualifications Panel.

In reaction to this news, the price of Xybernaut dropped another $0.18 per share from its closing price of $0.42 on March 31, 2005, to close at $0.24 on April 1, 2005.

66.    On April 8, 2005, Xybernaut issued a press release revealing further bad news: the Company had received a letter from its independent auditor, Grant Thornton, questioning the accuracy and reliability of the Company's accounting and related disclosures, and that, as a result, investors should not to rely on certain of the Company's historical financial statements. The Company stated as follows:

FAIRFAX, Va.--(BUSINESS WIRE)--April 8, 2005--Xybernaut® Corporation (NASDAQ: XYBRE - News) announced today that investors and others should refrain from relying upon the Company's historical financial statements, together with the related audit reports the Company received from its outside auditors, Grant Thornton LLP, for the years ended December 31, 2002 and

2003, and interim quarterly reports for the quarters ended March 31, 2003, June 30, 2003, September 30, 2003, March 31, 2004, June 30, 2004 and September 30, 2004.

The Company's action was taken in response to a letter which the Company received from Grant Thornton LLP, on April 6, 2005, indicating that the nature of the items disclosed by the Company in its Form 8-K filed on April 1, 2005, and the uncertainties surrounding the results of the ongoing Audit Committee investigation disclosed in such Form 8-K, have caused the firm to question the accuracy and reliability of the Company's accounting and related disclosures provided in the specified prior period financial statements. The Audit Committee has reviewed the Company's disclosure in this press release and in the Company's related Form 8-K with Grant Thornton LLP.

Upon completion of the Audit Committee's investigation, the Company intends promptly to implement any recommendations resulting from the Audit Committee's investigation and to take any other actions necessary to satisfy the concerns raised by Grant Thornton LLP. The Company has retained Kalorama Partners, LLC, a consulting firm founded by former SEC Chairman Harvey Pitt, to assist the Company in fulfilling these commitments.

The Company also announced today that on April 5, 2005, it received notice from The Nasdaq Stock Market of Nasdaq's intent to delist the Company's securities at the opening of business on April 14, 2005, subject to the Company's right to request a hearing with the Nasdaq Listing Qualifications Panel in accordance with the Marketplace Rule 4800 Series. In the notice, Nasdaq asserted that the Company is in violation of Nasdaq Marketplace Rule 4310(c)(14) because, as the Company previously announced, it has not yet filed its Annual Report on Form 10-K with Nasdaq and the SEC. Prior to April 12, 2005, the Company intends to request a hearing before a Nasdaq Listing Qualifications Panel to review the staffs determination which will suspend the delisting of the Company's securities until the hearing determination. There can be no assurance that, following the hearing, the Panel will grant the Company's request for continued listing.

In addition, as provided in the notice, at the opening of business on April 7, 2005, an "E" was appended to the end of the Company's trading symbol for its securities, so that the symbol became "XYBRE."

In reaction to this news, the price of Xybernaut stock, which had already fallen $0.23 per share since the Company's announcement on March 14, 2005 that it would not be able to timely file its annual report, fell another $0.06 to close at $0.13 on the next trading day, April 11, 2005.

67.    On April 19, 2005, Xybernaut issued a press release revealing further bad

completion of its internal investigation and the following shocking findings:

1.    The Company's Chairman and CEO, Edward G. Newman, improperly used substantial Company funds for personal expenses and failed properly to substantiate expenses charged to the Company.

2.    Members of the CEO's family employed by the Company were hired and evaluated/not evaluated in direct violation of the Company's anti-nepotism policy and constituted a "protected class" of employees.

3.    The employment of certain members of the CEO's family was not disclosed in SEC filings as required by SEC disclosure regulations.

4.    There has been a lack of adherence to effective disclosure controls governing the Company's public disclosures and the issuance of press releases.

5.    Major transactions were entered into by certain members of senior management in violation of Company internal controls. Certain members of Senior management failed properly to advise the Board of material financial conditions regarding major transactions.

6.    Certain members of senior management failed to disclose to the Audit Committee and the Board written correspondence by the Company's former Chief Financial Officer outlining serious concerns over the breakdown of internal controls; and

7.    Edward G. Newman and Steven A. Newman affirmatively impeded the Audit Committee's investigation in material respects.

In response to the Audit Committee's Report and Recommendations, the Board today approved the following actions:

1.    Edward G. Newman was removed as Chairman of the Board and Chief Executive Officer of the Company, and from all other positions he holds with any Company subsidiaries or affiliates.

2.    Steven A. Newman was removed as President and Chief Operating Officer of the Company, and Vice Chairman of the Board, and from all other positions he holds with any Company subsidiaries or affiliates.

3.    The Board formally requested the resignations of Edward G. and Steven A. Newman as Directors of the Company, but neither individual has agreed to resign from the Board at this time.

4.    Retired General William Tuttle was appointed as the Company's Interim

29

Chairman of the Board and Chief Executive Officer, while a search is conducted for new management.

5.    The Board authorized the retention of financial experts to assist the Board in maximizing shareholder value.

6.    In an effort to promote the independence of the Company's Board, three directors of the Company -- James J. Ralabate, Dr. Edwin Vogt and Martin Weisberg, each of whom provides other services for the Company -- offered to resign from the Board. The Board determined to defer its acceptance of these offers upon an orderly transition to a new Board.

The Company also announced that Grant Thornton LLP has resigned as the Company's independent auditors. The Company received a letter from Grant Thornton LLP on April 14, 2005, stating that Grant Thornton LLP has concluded that, in its professional judgment, it can no longer rely on management's representations and has resigned as the Company's registered independent accounting firm. On April 8, 2005, the Company advised investors and others that, based upon a letter the Company received from Grant Thornton LLP on April 6, 2005, no reliance should be placed upon certain of the Company's historical financial statements, together with the related audit reports the Company received from its outside auditors. In light of Grant Thornton LLP's resignation, the Company advises investors and others to continue to refrain from relying upon any of the Company's historical financial statements, together with the related audit reports the Company received from its outside auditors, Grant Thornton LLP.

The reports of Grant Thornton LLP on the Company's financial statements for the 2002 and 2003 fiscal years did not contain an adverse opinion or a disclaimer of opinion and were not qualified or modified as to uncertainty, audit scope, or accounting principles. In addition, in connection with the audits of the Company's financial statements for fiscal years 2002 and 2003, and in the subsequent interim periods, there were no disagreements between the Company and Grant Thornton LLP on any matter of accounting principles or practices, financial statement disclosure, or auditing scope or procedure which, if not resolved to the satisfaction of Grant Thornton LLP, would have caused Grant Thornton LLP to make reference to the matter in connection with its report.

However, as noted above, Grant Thornton LLP has now concluded that, in its professional judgment, it can no longer rely on management's representations. After Grant Thornton LLP was advised of the results of the Audit Committee investigation, Grant Thornton LLP advised the Audit Committee's counsel that certain members of senior management failed to disclose facts material to the financial statements and the weaknesses in the internal controls. The Audit Committee has discussed the basis for Grant Thornton LLP's conclusion with Grant Thornton LLP and has authorized Grant Thornton LLP to respond fully to the inquiries of any successor accountant concerning this subject. The Audit Committee has reviewed the Company's disclosure in this press release and in the

Company's related Form 8-K with Grant Thornton LLP.

In light of Grant Thornton LLP's resignation as the Company's independent auditor and the other matters discussed above, the Company is unable to predict when new auditors will be selected and its Form 10-K will be filed.

68.    On April 25, 2005, Xybernaut announced that the United States Attorneys Office for the Eastern District of Virginia had commenced an investigation of the Company relating to the wrongdoing discovered in it internal investigation. In addition, Xybernaut stated that "it continues to face a severe liquidity crisis and possible insolvency" and that it may not have sufficient cash to meet its financial obligations or fund continuing operations. To address these concerns, the Company announced the formation of the Office of the Chairman of the Board consisting of three co-chairmen. In the release, the Company stated, in relevant part, as follows:

> FAIRFAX, Va.--(BUSINESS WIRE)--April 25, 2005-- Xybernaut® Corporation (NASDAQ:XYBRE - News) today announced that William Tuttle and two other outside directors, Harry E. Soyster and Marc Ginsberg, will serve as co-chairmen in a newly created Office of the Chairman of the Board. Although the three co-chairmen will act as directors and not as management, they will provide counsel and be a resource to senior management.
>
> On April 23, 2005, Tuttle formally resigned as the Company's Interim Chairman and Chief Executive Officer and joined Soyster and Ginsberg in forming the newly created Office of Chairman of the Board. Tuttle's resignation was based upon his concerns about his ability to satisfy unilaterally the significant time commitments required to effectively address the needs of shareholders and employees. Tuttle also stated that he remains committed to continued participation in the effort to determine the best way forward for the Company, working along with Soyster and Ginsberg.
>
> The Company also announced that the Company was contacted Friday, April 22 by the U. S. Attorney's Office for The Eastern District of Virginia, which is opening an investigation. In addition, the Audit Committee, through its legal counsel, has contacted the Securities and Exchange Commission in connection with the previously disclosed Audit Committee investigation and findings. The Company will cooperate fully in these investigations and any others.
>
> The Company also affirmed that it continues to face a severe liquidity crisis and

possible insolvency. There can be no assurances that the Company will have sufficient cash to meet its financial obligations or fund continuing operations. The Office of the Chairman of the Board is authorized to retain a consultant with financial and management restructuring expertise. The Company intends to work with such adviser to reduce costs, conserve cash, and obtain advice regarding restructuring and other alternatives to maximize shareholder value.

## UNDISCLOSED ADVERSE INFORMATION

69.    The market for Xybernaut's securities was open, well-developed and efficient at all relevant times. As a result of these materially false and misleading statements and failures to disclose, Xybernaut's common stock traded at artificially inflated prices during the Class Period. The artificial inflation continued until at least April 8, 2005. Plaintiff and other members of the Class purchased or otherwise acquired Xybernaut securities relying upon the integrity of the market price of Xybernaut's securities and market information relating to Xybernaut, and have been damaged thereby.

70.    During the Class Period, defendants materially misled the investing public, thereby inflating the price of Xybernaut's securities, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make defendants' statements, as set forth herein, not false and misleading. Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations.

71.    At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, defendants made or caused to be made a series of materially false or misleading statements about Xybernaut's business, prospects

and operations. These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of Xybernaut and its business, prospects and operations, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false and misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein.

## ADDITIONAL SCIENTER ALLEGATIONS

72.    As alleged herein, defendants acted with scienter in that defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding Xybernaut, their control over, and/or receipt and/or modification of Xybernaut's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Xybernaut, participated in the fraudulent scheme alleged herein. In addition, defendants were motivated to engage in the fraudulent scheme to complete at least $25.85 million in private placements of Company stock and warrants, and long-term borrowings.

73.    Further, Defendant E. Newman's wife sold an unusually large number of shares during the class period in order to benefit from the artificially inflated price as

indicated in the chart below:

| Name | Date | Shares | Price | Total |
|---|---|---|---|---|
| Newman | 8/30/2004 | 10,000 | $1.20 | $12,000.00 |
| | 8/30/2004 | 5,000 | $1.19 | $5,950.00 |
| | 8/30/2004 | 30,000 | $1.18 | $35,400.00 |
| | 8/31/2004 | 5,000 | $1.18 | $5,900.00 |
| | 8/31/2004 | 15,000 | $1.19 | $17,850.00 |
| | 8/31/2004 | 13,700 | $1.20 | $16,440.00 |
| | 8/31/2004 | 600 | $1.20 | $720.06 |
| | 8/31/2004 | 5,700 | $1.21 | $6,897.00 |
| | 8/31/2004 | 5,000 | $1.22 | $6,100.00 |
| | 8/31/2004 | 3,000 | $1.23 | $3,690.00 |
| | 9/1/2004 | 5,000 | $1.19 | $5,951.00 |
| | 11/16/2004 | 50,000 | $1.09 | $54,500.00 |
| | 12/8/2004 | 10,000 | $1.26 | $12,600.00 |
| | 12/8/2004 | 23,900 | $1.27 | $30,353.00 |
| | 12/8/2004 | 600 | $1.27 | $762.90 |
| | 12/8/2004 | 500 | $1.27 | $635.70 |
| | 12/8/2004 | 600 | $1.29 | $774.06 |
| | 12/8/2004 | 1,000 | $1.29 | $1,290.60 |
| | 12/8/2004 | 8,400 | $1.29 | $10,836.00 |
| | 12/8/2004 | 1,300 | $1.30 | $1,690.00 |
| | 12/8/2004 | 3,700 | $1.31 | $4,847.00 |
| | | | | |
| | Total | 198,000 | | $235,187.32 |

## DEFENDANTS' FINANCIAL STATEMENTS DURING THE CLASS PERIOD WERE MATERIALLY FALSE AND MISLEADING AND VIOLATED GAAP

74.    At all relevant times during the Class Period, defendants represented that Xybernaut's financial statements when issued were prepared in conformity with GAAP, which are recognized by the accounting profession and the SEC as the uniform rules, conventions and procedures necessary to define accepted accounting practice at a particular time. However, in order to artificially inflate the price of Xybernaut's stock, defendants used improper accounting practices in violation of GAAP and SEC reporting

requirements to falsely inflate its assets, stockholders' equity and earnings during the Class Period.

75.    Xybernaut's materially false and misleading Financial Statements resulted from a series of deliberate senior management decisions designed to conceal the truth regarding Xybernaut's actual operating results. Specifically, as discussed herein, defendants caused the Company to violate GAAP by (1) improperly accounting for revenue related to certain product sales; (2) improperly accounting for expense reimbursements; and (3) failing to disclose and properly account for related party transactions in accordance with GAAP and SEC rules.

76.    GAAP are those principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practices at a particular time. As set forth in Financial Accounting Standards Board ("FASB") Statements of Concepts ("Concepts Statement") No. 1, one of the fundamental objectives of financial reporting is that it provide accurate and reliable information concerning an entity's financial performance during the period being presented. Concepts Statement No. 1, paragraph 42, states:

> Financial reporting should provide information about an enterprise's financial performance during a period. Investors and creditors often use information about the past to help in assessing the prospects of an enterprise. Thus, although investment and credit decisions reflect investors' and creditors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance.

77.    As set forth in SEC Rule 4-01(a) of SEC Regulation S-X, "[f]inancial statements filed with the [SEC] which are not prepared in accordance with [GAAP] will be presumed to be misleading or inaccurate." 17 C.F.R. § 210.4-01(a)(1).

## Xybernaut's Improper Failure To Disclose Material Related Party Transactions

78.    In FASB's Statement of Financial Accounting Standard ("SFAS") No. 57,

*Related Party Disclosures* (March 1982), GAAP provides guidance on disclosures of

transactions between related parties.[1] SFAS No. 57 states that an "enterprise's financial

statements may not be complete without additional explanations of and information about

related party transactions and thus may not be reliable." Accordingly, SFAS No. 57 requires

that financial statements identify material related party transactions and disclose (a) the

"nature of the relationship(s)," (b) a "description of the transactions," (c) the "dollar amount

of transactions for each period for which an income statement is presented," and (d) the

"[A]mounts due from or to the related parties as of the date of each balance sheet. "[2]

79.    In addition, as noted in the SEC's SAB Topic 4E, GAAP provides that:

> [I]n some cases, the significance of an amount may be independent of the
> amount involved For example, amounts due to and from officers and
> directors, because of their special nature and origin, ought generally to be
> set forth separately [in financial statements] even though the dollar amounts
> involved are relatively small.

80.    As Xybernaut has now admitted, before and during the Class Period, it

engaged in numerous material related party and self-dealing transactions that were not

disclosed in its financial statements in violation of GAAP, including at least the following

(during the Class Period):

   a.        Defendant Edward Newman's improper use of substantial

Company funds for personal expenses and failure to properly substantiate

expenses charged to the Company; and

---

1 Pursuant to SFAS No. 57, related party transactions include transactions between an enterprise and its Directors, CEO, COO, Vice Presidents in charge of principal business functions, and other persons who perform similar policy-making functions
2 Pursuant to SFAS No. 57, disclosure of compensation arrangements that are not in the ordinary course is

b.              Major transactions entered into by certain members of senior management in violation Company internal controls and their failure to properly advise the Board of Directors of material financial conditions regarding the transactions.

81.    Moreover, GAAP, in APB Opinion No. *22, Disclosure of Accounting Policies* ¶ 7 (April 1972), provides that the usefulness of financial statements in making economic decisions depends significantly upon the user's understanding of the accounting policies followed by a company. In fact, GAAP states that information about the accounting policies adopted by a reporting company is "essential" for financial statement users. *Id.* at ¶ 8. Accordingly, GAAP, in paragraph 12 of APB Opinion No. 22 provides:

> In general, the disclosure should encompass important judgments as to appropriateness of principles relating to recognition of revenue and allocation of asset costs to current and future periods; in particular, it should encompass those accounting principles and methods that involve any of the following:
>
> a.    A selection from existing acceptable alternatives;
>
> b.    Principles and methods peculiar to the industry in which the reporting entity operates, even if such principles and methods are predominantly followed in that industry; and
>
> c.    Unusual or innovative applications of generally accepted accounting principles (and, as applicable, of principles and methods peculiar to the industry in which the reporting entity operates).

82.    Xybernaut's Class Period financial statements were thus also false and misleading and failed to comply with GAAP because they failed to disclose and identify the improper accounting of revenue related to certain product sales. Accordingly, investors were unable to assess the appropriateness of, or the risks associated with, Xybernaut's

necessary for users to understand financial statements.