# PART 2

financial reporting.

83.     Xybernaut's failures violated a number of additional GAAP provisions. For example, GAAP provides that:

1.     financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit and similar decisions (CON No. 1, ¶ 34);

2.     financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and the effects of transactions, events and circumstances that change resources and claims to those resources (CON No. 1, ¶ 40);

3.     financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it. To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general (CON No. 1, ¶ 50);

4.     financial reporting should provide information about an enterprise's financial performance during a period. Investors and creditors often use information about the past to help in assessing the prospects of an enterprise. Thus, although investment and credit decisions reflect investors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance (CON No. 1, ¶ 42);

5.     financial reporting should be reliable in that it represents what it purports to

represent. That information should be reliable as well as relevant is a notion that is central to accounting (CON No. 2, ¶¶ 58-59);

6.    financial reporting should be complete, so that nothing is left out of the information that may be necessary to ensure that it validly represents underlying events and conditions (CON No. 2, ¶ 79); and

7.    financial reporting should be conservative and ensure that uncertainties and risks inherent in business situations are adequately considered. The best way to avoid injury to investors is to try to ensure that what is reported represents what it purports to represent (CON No. 2, ¶¶ 95, 97).

### Failure to Maintain an Adequate System of Internal Controls

84.    In addition to the foregoing improper accounting practices, the Company also suffered from a chronic and systematic breakdown of its internal accounting controls throughout the Class Period, which rendered Xybernaut's financial reporting inherently corrupt, subject to manipulation and unreliable, resulting in materially false and misleading financial statements.

85.    In this regard, the Defendants failed to design and implement an internal control system over the Company's financial reporting processes allowing defendants to improperly report revenue related to the sale of certain products, and to engage in improper related party transactions.

86.    Section 13(b)(2) of the Exchange Act states, in pertinent part, that every reporting company must: (A) make and keep books, records and accounts which, in reasonable detail, accurately and fairly reflect the transactions and disposition of the assets of the issuer; and (B) devise and maintain a system of internal controls sufficient to provide

reasonable assurances that transactions are recorded as necessary to permit the preparation of financial statements in conformity with GAAP. These provisions require an issuer to employ and supervise reliable personnel, to maintain reasonable assurances that transactions are executed as authorized, to properly record transactions on an issuer's books and, at reasonable intervals, to compare accounting records with physical assets.

87.     Xybernaut violated Section 13(b)(2)(A) of the Exchange Act by failing to maintain accurate records concerning its reporting of revenue related to certain product sales, related party transactions entered into by members of the Company's senior management, and reimbursements of expenses. Accordingly, Xybernaut violated Section 13(b)(2)(A) of the Exchange Act.

88.     In addition, Xybernaut violated Section 13(b)(2)(B) of the Exchange Act by failing to implement procedures reasonably designed to prevent accounting irregularities. Xybernaut failed to put into place proper reviews and checks to ensure that its management did not engage in accounting improprieties. It failed to ensure that transactions were reported in accordance with its own policies and with GAAP. Accordingly, Xybernaut violated Section 13(b)(2)(B) of the Exchange Act.

89.     Xybernaut's lack of adequate internal controls rendered Xybernaut's Class Period financial reporting inherently unreliable and precluded the Company from preparing financial statements that complied with GAAP. Nonetheless, throughout the Class Period, the Company regularly issued quarterly and annual financial statements without ever disclosing the existence of the significant and material deficiencies in its internal accounting controls and falsely asserted that its financial statements complied with GAAP.

## DEFENDANT GRANT THORNTON LLP
## PARTICIPATION IN THE FRAUD AND ITS SCIENTER

90.    Defendant Grant Thornton is a worldwide firm of certified public accountants, auditors, and consultants. Grant Thornton's website states that "[t]hrough member firms in 110 countries, including 49 *offices* in the United States, the partners of Grant Thornton member firms provide personalized attention and the highest quality service to public and private clients around the globe." Through its Vienna, Virginia office, Grant Thornton served as Xybernaut's auditor and principal accounting firm since fiscal 2000. Grant Thornton was required to audit the Company's financial statements in accordance with Generally Accepted Auditing Standards ("GAAS")[3], and to report the audit results to Xybernaut, the board of directors, the audit committee, and the members of the investing public, including Plaintiff and other members of the Class. With knowledge of Xybernaut's true financial condition, or in reckless disregard thereof, Grant Thornton certified the materially false and misleading financial statements of Xybernaut, described below and provided unqualified Independent Auditors' Reports, which were included in the SEC filings and publicly disseminated statements. Without these materially false and misleading unqualified audit opinions, the fraud alleged above could not have been perpetrated.

### Grant Thornton Had Full and Complete Access to Xybernaut's Information

91.    Grant Thornton, by virtue of its of its relationship with Xybernaut and the nature of the auditing and consulting services rendered to the Company, and the fact that Grant Thornton's personnel were regularly present at Xybernaut and had intimate knowledge of Xybernaut's financial reporting practices based on its access to confidential internal

---

[3] GAAS, as approved and adopted by the American Institute of Certified Public Accountants ("AICPA"), relate to the conduct of the individual audit engagements. Statements on Auditing Standards (codified and referred to as AU § ___) are recognized by the AICPA as the interpretation of GAAS.

corporate, financial, operating and business information, Grant Thornton knew of or recklessly disregarded the adverse facts alleged herein concerning the Company's improper financial reporting during the Class Period, including the Company's fiscal 2002 and 2003 year-end financial statements and Grant Thornton's unqualified audit opinions thereon. Nonetheless, Grant Thornton knowingly, or recklessly, issued false unqualified audit opinions during the Class Period.

## Grant Thornton Failed to Render an Accurate Audit Report

92.    Grant Thornton violated GAAS Standard of Reporting No. 1 that requires the audit report to state whether the financial statements are presented in accordance with GAAP. AU § 508.04. Grant Thornton's opinion falsely represented that Xybernaut's fiscal 2002 and 2003 financial statements were presented in conformity with GAAP when they were not for the myriad reasons herein alleged.

93.    The auditor's report must express an opinion on the financial statements taken as a whole and must contain a clear indication of the character of the auditor's work. The auditor can determine that he is able to express an unqualified opinion only if he has conducted his audit in accordance with GAAS. AU § 508.07.

94.    Grant Thornton did not render an accurate audit report and thus did not exercise due professional care, because Xybernaut's financial statements were not in conformity with GAAP, and because Grant Thornton failed to perform sufficient procedures to audit Xybernaut's financial statements as of December 31, 2002 and 2003, in accordance with GAAS.

95.    Grant Thornton issued its audit opinion, dated February 13, 2003, except for Notes 3 and 14, as to which the date is March 26, 2003, on Xybernaut's fiscal 2002 financial

statements. Grant Thornton's opinion stated that such Xybernaut financial statements were

presented in conformity with GAAP and that Grant Thornton's audit was performed in

accordance with GAAS :

> We have audited the accompanying consolidated balance sheets of
> Xybernaut Corporation (a Delaware corporation) as of December 31, 2002 and
> 2001, and the related consolidated statements of operations, stockholders'
> equity, and cash flows for the three years then ended. These financial
> statements are the responsibility of the Company's management. Our
> responsibility is to express an opinion on these financial statements based
> on our audits.
>
> We conducted our audits in accordance with auditing standards generally
> accepted in the United States of America. Those standards require that we
> plan and perform the audit to obtain reasonable assurance about whether
> the financial statements are free of material misstatement. An audit includes
> examining, on a test basis, evidence supporting the amounts and disclosures
> in the financial statements. An audit also includes assessing the accounting
> principles used and significant estimates made by management, as well as
> evaluating the overall financial statement presentation. We believe that our
> audits provide a reasonable basis for our opinion.
>
> In our opinion, the financial statements referred to above present fairly, in all
> material respects, the financial position of Xybernaut Corporation as of
> December 31, 2002 and 2001, and the results of its operations and its cash
> flows for the three years then ended in conformity with accounting principles
> generally accepted in the United States of America.

96.    Grant Thornton issued its audit opinion, dated February 19, 2004, on

Xybernaut's fiscal 2003 financial statements, which it stated were presented in conformity

with GAAP and that Grant Thornton's audit was performed in accordance with GAAS:

> We have audited the accompanying consolidated balance sheets of
> Xybernaut Corporation (a Delaware corporation) as of December 31, 2003 and
> 2002, and the related consolidated statements of operations, stockholders'
> equity, and cash flows for the three years then ended. These financial
> statements are the responsibility of the Company's management. Our
> responsibility is to express an opinion on these financial statements based
> on our audits.
>
> We conducted our audits in accordance with auditing standards generally
> accepted in the United States of America. Those standards require that we

43

plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of Xybernaut Corporation as of December 31, 2003 and 2002, and the results of its operations and its cash flows for the three years then ended in conformity with accounting principles generally accepted in the United States of America.

97.    In issuing such audit opinions, Grant Thornton turned a blind eye to Xybernaut's improper accounting practices, as described above, and issued unqualified audit opinions on Xybernaut's fiscal 2002 and 2003 financial statements, even though Grant Thornton knew or recklessly disregarded that: (a) the financial statements had not been prepared in conformity with GAAP in numerous respects and did not present fairly, in all material respects, the financial position of Xybernaut and its subsidiaries as of December 31, 2002 and 2003, and the results of their operations and cash flow for the years ended December 31, 2002 and 2003; and (b) Grant Thornton had not audited Xybernaut's fiscal 2002 and 2003 financial statements in accordance with GAAS. As set forth in detail herein, Xybernaut's violations of GAAP during the Class Period include, among other things:

- the improper reporting of revenue relating to certain product sales;

- improper accounting of related party transactions entered into by members of the Company's senior management; and

- improper accounting of reimbursement of Company expenses.

## Grant Thornton Failed to Obtain Sufficient Competent Evidential Matter

98.    During the course of Grant Thornton's audits of Xybernaut, there appeared "red flags" which should have raised questions in the auditors' minds and led them to procure additional evidential matter. In conducting an audit, an auditor must obtain sufficient competent evidential matter through inspection, observation, inquiries and confirmations to afford a reasonable basis for an opinion regarding the financial statements under audit. AU § 326.01

99.    For example, during the Class Period, Grant Thornton knew or recklessly disregarded the following "red flags":

(A)    The Xybernaut Defendants' willingness and desire of the Company's Chairman and CEO, Edward G. Newman, improperly used substantial Company funds for personal expenses and failed properly to substantiate expenses charged to the Company.

(B)    Members of the CEO's family employed by the Company were hired and evaluated/not evaluated in direct violation of the Company's anti-nepotism policy and constituted a "protected class" of employees.

(C)    The employment of certain members of the CEO's family was not disclosed in SEC filings as required by SEC disclosure regulations.

(D)    There has been a lack of adherence to effective disclosure controls governing the Company's public disclosures and the issuance of press releases.

(E)    Major transactions were entered into by certain members of senior management in violation of Company internal controls. Certain members of Senior management failed properly to advise the Board of material financial conditions regarding major transactions.

100.    The foregoing "red flags" provided notice to Grant Thornton about Xybernaut management's character and lack of integrity. Management's lack of integrity should, in turn, have caused Grant Thornton to re-evaluate its risk assessments. GAAS requires that

risk assessments, and accordingly, any reevaluations of risk assessments, should be made with consideration of applicable risk factors. *See* AU §§ 316.12, 316.14. The auditor's response to a risk assessment should be "influenced by the nature and significance of the risk factors identified as being present." AU § 316.25. One of the principal categories of "risk factors that relate to misstatements arising from fraudulent financial reporting" is an "[i]nadequate monitoring of significant controls." AU § 316.17.

101.    Grant Thornton also failed to comply with Statement on Auditing Standards No. 8, in that Grant Thornton failed to take appropriate action relating to material misstatements of fact contained in the MD&A section of Xybernaut's Forms 10-K during the Class Period relating to the disclosures regarding earnings, as evidenced by the "lack of adherence to effective disclosure controls governing the Company's public disclosures ...." *See* AU § 550.

## Grant Thornton Failed to Exercise Due Professional Care

102.    Auditors must exercise due professional care in performing the audit and preparing the audit report. AU § 230.01. Due professional care concerns what the auditor does and how well he does it. AU § 230.04.

103.    Grant Thornton did not exercise due professional care because it failed to: obtain sufficient competent evidential matter to support the assertions in the financial statements; maintain an attitude of professional skepticism; and render an accurate audit report on behalf of Xybernaut.

104.    Grant Thornton violated GAAS Standard of Reporting No. 3 that requires that, informative disclosures in the financial statements are to be regarded as reasonably adequate unless otherwise stated in the report. Grant Thornton knew or recklessly that

Xybernaut's disclosures were not reasonably adequate.

105.    For example, Grant Thornton ignored the fact that Xybernaut failed to make adequate disclosures concerning accounting policies relating to the recognition of revenue on the sales of certain products. GAAP provides that the usefulness of financial statements in making economic decisions depends significantly upon the user's understanding of the accounting policies followed by a company. APB Opinion No. 22 ¶ 7. In fact, GAAP states that information about the accounting policies adopted by a reporting company is "essential" for financial statement users. *Id.* at ¶ *8.* Accordingly, GAAP, in APB Opinion No. 22 ¶12, provides:

> In general, the disclosure should encompass important judgments as to appropriateness of principles relating to recognition of revenue and allocation of asset costs to current and future periods; in particular, it should encompass those accounting principles and methods that involve any of the following:
>
> a.    A selection from existing acceptable alternatives;
>
> b.    Principles and methods peculiar to the industry in which the reporting entity operates, even if such principles and methods are predominantly followed in that industry; and
>
> c.    Unusual or innovative applications of generally accepted accounting principles (and, as applicable, of principles and methods peculiar to the industry in which the reporting entity operates).

106.    Accordingly, because Xybernaut "omit[ted] from the financial statements, including the accompanying notes, information that [was] required by generally accepted accounting principles, [Grant Thornton] should [have] express[ed] a qualified or an adverse opinion and should [have] provide[d] the information in [their] report." AU § 431.03.

107.    Grant Thornton violated GAAS Standard of Reporting No. 4 that requires that, when an opinion on the financial statements as a whole cannot be expressed, the reasons

therefore must be stated. Grant Thornton should have stated that no opinion could be issued by it on Xybernaut's fiscal 2002 or 2003 financial statements or issued an adverse opinion stating that the fiscal 2002 and 2003 financial statements were not fairly presented.

108.    Grant Thornton violated GAAS General Standard No. 2 that requires that independence in mental attitude is to be maintained by the auditor in all matters related to the assignment.

109.    Grant Thornton violated SAS No. 82 in that it failed to adequately consider the risk that the audit financial statements of Xybernaut were free from material misstatement, whether caused by errors or fraud. Grant Thornton knew or recklessly ignored numerous risks relevant to financial reporting including events and circumstances that occurred or existed at Xybernaut during the Class period, which adversely affected Xybernaut's ability to initiate, record, process, and report financial data consistent with the assertions of management in the financial statements. These events or circumstances include, but are not limited to:

- *Changes in operating environment.* Changes in the regulatory or operating environment can result in changes in competitive pressures and significantly different risks.

- *New or revamped information systems.* Significant and rapid changes in information systems can change the risk relating to internal control.

- *Rapid growth.* Significant and rapid expansion of operations can strain controls and increase the risk of a breakdown in controls.

- *New technology.* Incorporating new technologies into production processes or information systems may change the risk associates with internal control.

- *New business models, products, or activities.* Entering into business areas or transactions with which an entity has little experience may introduce new risks associated with internal control.

- *Corporate restructurings.* Restructurings may be accompanied by staff

48

reductions and changes in supervision and segregation of duties that may change the risk associated with internal control.

- *New accounting pronouncements.* Adoption of new accounting principles or changing accounting principles may affect risks in preparing financial statements.

110.    Grant Thornton violated GAAS and the standards set forth in SAS No. 1 and SAS No. 53 by, among other things, failing to adequately plan its audit and properly supervise the work of assistants and to establish and carry out procedures reasonably designed to search for and detect the existence of errors and irregularities that would have a material effect upon the financial statements.

111.    Grant Thornton violated GAAS and the standards set forth in SAS No. 8, by failing to take appropriate action relating to material misstatements of fact contained in the MD&A section of Xybernaut's fiscal 2002 and 2003 Forms 10-K relating to the disclosures regarding the recognition of revenue recognition related to certain product sales.

112.    Grant Thornton violated GAAS Standard of Field Work No. 2, which requires the auditor to make a proper study of existing internal controls, including accounting, financial and managerial controls, to determine whether reliance thereon was justified, and if such controls are not reliable, to expand the nature and scope of the auditing procedures to be applied. The standard provides that a sufficient understanding of an entity's internal control structure be obtained to adequately plan the audit and to determine the nature, timing and extent of tests to be performed. AU § 150.02. In all audits, the auditor should perform procedures to obtain a sufficient understanding of three elements of an entity's internal control structure: the control environment, the accounting system, and control procedures. AU § 319.02.

113.    As a result of its failure to accurately report on Xybernaut's fiscal 2002 and

2003 financial statements, Grant Thornton utterly failed in its role as an auditor as defined

by the SEC. SEC Accounting Series Release No. 296, Relationships Between Registrants

and Independent Accountants, Securities Act Release No. 6341, Exchange Act Release No.

18044, states in part:

> Moreover, the capital formation process depends in large part on the
> confidence of investors in financial reporting. An investor's willingness to
> commit his capital to an impersonal market is dependent on the availability of
> accurate, material and timely information regarding the corporations in which
> he has invested or proposes to invest. The quality of information
> disseminated in the securities markets and the continuing conviction of
> individual investors that such information is reliable are thus key to the
> formation and effective allocation of capital. Accordingly, the audit function
> must be meaningfully performed and the accountants' independence not
> compromised. The auditor must be free to decide questions against his
> client's interests if his independent professional judgment compels that
> result.

114.    Grant Thornton's opinions, which represented that Xybernaut's fiscal 2002

and 2003 year end financial statements were presented in conformity with GAAP, were

materially false and misleading because Grant Thornton knew or was reckless in not

knowing that Xybernaut's fiscal 2002 and 2003 year end financial statements violated the

principles of fair reporting and GAAP. In the course of rendering its unqualified audit

certification on Xybernaut's fiscal 2002 and 2003 year end financial statements, Grant

Thornton knew it was required to adhere to each of the herein described standards and

principles of GAAS, including the requirement that the financial statements comply in all

material respects with GAAP. Grant Thornton, in issuing its unqualified opinions, knew or

recklessly disregarded that by doing so it was engaging in gross departures from GAAS,

thus making its opinions false, and issued such certifications knowing or recklessly

disregarding that GAAS had been violated.

115.    Grant Thornton knew or recklessly disregarded facts that indicated that it

should have: (a) disclaimed or issued adverse opinions on Xybernaut's fiscal 2002 and 2003 year end financial statements; or (b) withdrawn, corrected or modified its opinion for the years ended December 31, 2002 and 2003 to recognize Xybernaut's improper accounting and financial reporting stated above.

116.    Accordingly, Grant Thornton ignored the guidance under Section IOA of the Securities and Exchange Act which requires the auditor to design procedures "to identify related party transactions that are material to the financial statements or otherwise require disclosure therein . . . ." In addition, Grant Thornton failed to evaluate all the information available concerning the related party transactions, to determine whether they were adequately disclosed, in accordance with SFAS 57, in the financial statements. *See* AU § 334.11.

117.    Grant Thornton ignored that "evidence of significant or extensive undisclosed related party transactions" is indicative of a significant deficiency in the design or operation of internal control that could adversely affect Xybernaut's "ability to record process, summarize, and report financial data consistent with the assertions of management in the financial statements." AU § 325.21.

118.    Grant Thornton failed to consider whether additional audit testing was required for related party transactions, it also regularly failed to undertake some of the basic audit procedures in connection with related party transactions. AU § 334.08. Moreover, once an auditor has identified related party transactions, the auditor should apply the procedures he considers necessary to obtain satisfaction concerning the purpose, nature, and extent of these transactions and their effect on the financial statements. AU § 334.09. The procedures should be directed toward obtaining and

evaluating sufficient competent evidential matter and should extend beyond inquiry of management. AU § 334.09.

119.   According to SAB No. 99, "quantitative benchmarks for assessing materiality (e.g., a five percent threshold) do not apply in circumstances involving self-dealing and misappropriation of corporate assets by senior management."

<u>**COUNT I**</u>

**VIOLATION OF SECTION 10(b) OF**
**THE EXCHANGE ACT AND RULE 10b-5 PROMULGATED**
<u>**THEREUNDER AGAINST ALL DEFENDANTS OTHER THAN GRANT THORNTON**</u>

120.   Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

121.   During the Class Period, Xybernaut and the Individual Defendants, and each of them, carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Xybernaut's securities; and (iii) cause Plaintiff and other members of the Class to purchase Xybernaut's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

122.   Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's

securities in an effort to maintain artificially high market prices for Xybernaut's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

123.    In addition to the duties of full disclosure imposed on defendants as a result of their making of affirmative statements and reports, or participation in the making of affirmative statements and reports to the investing public, defendants had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC as embodied in SEC Regulation S-X (17 C.F.R. Sections 210.01 et seq.) and Regulation S-K (17 C.F.R. Sections 229.10 et seq.) and other SEC regulations, including accurate and truthful information with respect to the Company's operations, financial condition and earnings so that the market price of the Company's securities would be based on truthful, complete and accurate information.

124.    Xybernaut and the Individual Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of Xybernaut as specified herein.

125.    These defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Xybernaut's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state

material facts necessary in order to make the statements made about Xybernaut and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of Xybernaut's securities during the Class Period.

126. Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of his responsibilities and activities as a senior officer and/or director of the Company was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of and had access to other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

127. The defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Xybernaut's

operating condition and future business prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by defendants' overstatements and misstatements of the Company's business, operations and earnings throughout the Class Period, defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

128.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Xybernaut's securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of Xybernaut's publicly-traded securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by defendants but not disclosed in public statements by defendants during the Class Period, Plaintiff and the other members of the Class acquired Xybernaut securities during the Class Period at artificially high prices and were damaged thereby.

129.    At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiff and the other members of the Class and the marketplace known of the true financial condition and business prospects of Xybernaut, which were not disclosed by defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Xybernaut securities, or, if they had acquired such securities

during the Class Period, they would not have done so at the artificially inflated prices which they paid.

130.    By virtue of the foregoing, defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

131.    As a direct and proximate result of defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

### COUNT II

### VIOLATION OF SECTION 20(a) OF
### THE EXCHANGE ACT AGAINST THE INDIVIDUALS DEFENDANTS

132.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

133.    The Individual Defendants acted as controlling persons of Xybernaut within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contend are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and

had the ability to prevent the issuance of the statements or cause the statements to be corrected.

134.   In particular, each of these defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

135.   As set forth above, Xybernaut and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

### COUNT III

### VIOLATION OF SECTION 10(b) OF THE SECURITIES EXCHANGE ACT AND RULE 10(b)5 AGAINST DEFENDANT GRANT THORNTON

136.   Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

137.   The foregoing allegations are based upon quarterly and annual financial statements filed by Xybernaut with the SEC and other public releases issued by Xybernaut during the relevant time period.

138.   Grant Thornton issued its unqualified audit opinion on the Fiscal Year 2002 and 2003 consolidated financial statements in its reports to the Board of Directors and Shareholders.   Those reports stated that the financial statements were presented in

accordance with GAAP based on the results of the Grant Thornton audits which were preformed in accordance with GAAS. These statements are false. In fact, Grant Thornton's audit reports were false and misleading due to, among other things, Grant Thornton's failure to audit in accordance with Generally Accepted Accounting Standards ("GAAS") and the fact that Xybernaut's 2002 and 2003 financial statements were not prepared in conformity with GAAP, causing Grant Thornton's reports to be in violation of GAAS and SEC rules.

139. GAAS, as approved and adopted by the American Institute of Certified Public Accountants ("AICPA"), relate to the conduct of individual audit engagements. Statements on Auditing Standards are recognized by the AICPA as the interpretation of GAAS.

140. For example, during the Class Period, Grant Thornton knew or recklessly disregarded the following "red flags":

    (A)   The Xybernaut Defendants' willingness and desire of the Company's Chairman and CEO, Edward G. Newman, improperly used substantial Company funds for personal expenses and failed properly to substantiate expenses charged to the Company.

    (B)   Members of the CEO's family employed by the Company were hired and evaluated/not evaluated in direct violation of the Company's anti-nepotism policy and constituted a "protected class" of employees.

    (C)   The employment of certain members of the CEO's family was not disclosed in SEC filings as required by SEC disclosure regulations.

    (D)   There has been a lack of adherence to effective disclosure controls governing the Company's public disclosures and the issuance of press releases.

    (E)   Major transactions were entered into by certain members of senior management in violation of Company internal controls. Certain members of senior management failed properly to advise the Board of material financial conditions regarding major transactions.

141. The foregoing "red flags" provided notice to Grant Thornton about Xybernaut

management's character and lack of integrity. Management's lack of integrity should, in turn, have caused Grant Thornton to re-evaluate its risk assessments. GAAS requires that risk assessments, and accordingly, any reevaluations of risk assessments, should be made with consideration of applicable risk factors. *See* AU §§ 316.12, 316.14. The auditor's response to a risk assessment should be "influenced by the nature and significance of the risk factors identified as being present." AU § 316.25. One of the principal categories of "risk factors that relate to misstatements arising from fraudulent financial reporting" is an "[i]nadequate monitoring of significant controls." AU § 316.17.

142.    Grant Thornton also failed to comply with Statement on Auditing Standards No. 8, in that Grant Thornton failed to take appropriate action relating to material misstatements of fact contained in the MD&A section of Xybernaut's Forms 10-K during the Class Period relating to the disclosures regarding earnings, as evidenced by the "lack of adherence to effective disclosure controls governing the Company's public disclosures ...." *See* AU § 550.

### Grant Thornton Failed to Exercise Due Professional Care

143.    Auditors must exercise due professional care in performing the audit and preparing the audit report. AU § 230.01. Due professional care concerns what the auditor does and how well he does it. AU § 230.04.

144.    Grant Thornton did not exercise due professional care because it failed to: obtain sufficient competent evidential matter to support the assertions in the financial statements; maintain an attitude of professional skepticism; and render an accurate audit report on behalf of Xybernaut.

145.    Grant Thornton violated GAAS Standard of Reporting No. 3 that requires that,

informative disclosures in the financial statements are to be regarded as reasonably adequate unless otherwise stated in the report. Grant Thornton knew or recklessly that Xybernaut's disclosures were not reasonably adequate.

146.    For example, Grant Thornton ignored the fact that Xybernaut failed to make adequate disclosures concerning accounting policies relating to the recognition of revenue on the sales of certain products. GAAP provides that the usefulness of financial statements in making economic decisions depends significantly upon the user's understanding of the accounting policies followed by a company. APB Opinion No. 22 ¶ 7. In fact, GAAP states that information about the accounting policies adopted by a reporting company is "essential" for financial statement users. *Id.* at ¶ 8. Accordingly, GAAP, in APB Opinion No. 22 ¶ 12, provides:

> In general, the disclosure should encompass important judgments as to appropriateness of principles relating to recognition of revenue and allocation of asset costs to current and future periods; in particular, it should encompass those accounting principles and methods that involve any of the following:
>
> a.    A selection from existing acceptable alternatives;
>
> b.    Principles and methods peculiar to the industry in which the reporting entity operates, even if such principles and methods are predominantly followed in that industry; and
>
> c.    Unusual or innovative applications of generally accepted accounting principles (and, as applicable, of principles and methods peculiar to the industry in which the reporting entity operates).

147.    Accordingly, because Xybernaut "omit[ted] from the financial statements, including the accompanying notes, information that [was] required by generally accepted accounting principles, [Grant Thornton] should [have] express[ed] a qualified or an adverse opinion and should [have] provide[d] the information in [their] report." AU § 431.03.

148.    Grant Thornton violated GAAS Standard of Reporting No. 4 that requires that, when an opinion on the financial statements as a whole cannot be expressed, the reasons therefore must be stated. Grant Thornton should have stated that no opinion could be issued by it on Xybernaut's fiscal 2002 or 2003 financial statements or issued an adverse opinion stating that the fiscal 2002 and 2003 financial statements were not fairly presented.

149.    Grant Thornton violated GAAS General Standard No. 2 that requires that independence in mental attitude is to be maintained by the auditor in all matters related to the assignment.

150.    Grant Thornton violated SAS No. 82 in that it failed to adequately consider the risk that the audit financial statements of Xybernaut were free from material misstatement, whether caused by errors or fraud. Grant Thornton knew or recklessly ignored numerous risks relevant to financial reporting including events and circumstances that occurred or existed at Xybernaut during the Class period, which adversely affected Xybernaut's ability to initiate, record, process, and report financial data consistent with the assertions of management in the financial statements. These events or circumstances include, but are not limited to:

- *Changes in operating environment.* Changes in the regulatory or operating environment can result in changes in competitive pressures and significantly different risks.

- *New or revamped information systems.* Significant and rapid changes in information systems can change the risk relating to internal control.

- *Rapid growth.* Significant and rapid expansion of operations can strain controls and increase the risk of a breakdown in controls.

- *New technology.* Incorporating new technologies into production processes or information systems may change the risk associates with internal control.

- *New business models, products, or activities.* Entering into business areas or

transactions with which an entity has little experience may introduce new risks associated with internal control.

- *Corporate restructurings.* Restructurings may be accompanied by staff reductions and changes in supervision and segregation of duties that may change the risk associated with internal control.

- *New accounting pronouncements.* Adoption of new accounting principles or changing accounting principles may affect risks in preparing financial statements.

151.    Grant Thornton violated GAAS and the standards set forth in SAS No. 1 and SAS No. 53 by, among other things, failing to adequately plan its audit and properly supervise the work of assistants and to establish and carry out procedures reasonably designed to search for and detect the existence of errors and irregularities that would have a material effect upon the financial statements.

152.    Grant Thornton violated GAAS and the standards set forth in SAS No. 8, by failing to take appropriate action relating to material misstatements of fact contained in the MD&A section of Xybernaut's fiscal 2002 and 2003 Forms 10-K relating to the disclosures regarding the recognition of revenue recognition related to certain product sales.

153.    Grant Thornton violated GAAS Standard of Field Work No. 2, which requires the auditor to make a proper study of existing internal controls, including accounting, financial and managerial controls, to determine whether reliance thereon was justified, and if such controls are not reliable, to expand the nature and scope of the auditing procedures to be applied. The standard provides that a sufficient understanding of an entity's internal control structure be obtained to adequately plan the audit and to determine the nature, timing and extent of tests to be performed. AU § 150.02. In all audits, the auditor should perform procedures to obtain a sufficient understanding of three elements of an entity's internal control structure: the control environment, the accounting system, and control

procedures. AU § 319.02.

154.    As a result of its failure to accurately report on Xybernaut's fiscal 2002 and

2003 financial statements, Grant Thornton utterly failed in its role as an auditor as defined

by the SEC. SEC Accounting Series Release No. 296, Relationships Between Registrants

and Independent Accountants, Securities Act Release No. 6341, Exchange Act Release No.

18044, states in part:

> Moreover, the capital formation process depends in large part on the
> confidence of investors in financial reporting. An investor's willingness to
> commit his capital to an impersonal market is dependent on the availability of
> accurate, material and timely information regarding the corporations in which
> he has invested or proposes to invest. The quality of information
> disseminated in the securities markets and the continuing conviction of
> individual investors that such information is reliable are thus key to the
> formation and effective allocation of capital. Accordingly, the audit function
> must be meaningfully performed and the accountants' independence not
> compromised. The auditor must be free to decide questions against his
> client's interests if his independent professional judgment compels that
> result.

155.    Grant Thornton's opinions, which represented that Xybernaut's fiscal 2002

and 2003 year end financial statements were presented in conformity with GAAP, were 46

materially false and misleading because Grant Thornton knew or was reckless in not

knowing that Xybernaut's fiscal 2002 and 2003 year end financial statements violated the

principles of fair reporting and GAAP. In the course of rendering its unqualified audit

certification on Xybernaut's fiscal 2002 and 2003 year end financial statements, Grant

Thornton knew it was required to adhere to each of the herein described standards and

principles of GAAS, including the requirement that the financial statements comply in all

material respects with GAAP. Grant Thornton, in issuing its unqualified opinions, knew or

recklessly disregarded that by doing so it was engaging in gross departures from GAAS,

thus making its opinions false, and issued such certifications knowing or recklessly

disregarding that GAAS had been violated.

156.   Grant Thornton knew or recklessly disregarded facts that indicated that it should have: (a) disclaimed or issued adverse opinions on Xybernaut's fiscal 2002 and 2003 year end financial statements; or (b) withdrawn, corrected or modified its opinion for the years ended December 31, 2002 and 2003 to recognize Xybernaut's improper accounting and financial reporting stated above.

157.   Accordingly, Grant Thornton ignored the guidance under Section IOA of the Securities and Exchange Act which requires the auditor to design procedures "to identify related party transactions that are material to the financial statements or otherwise require disclosure therein . . . ." In addition, Grant Thornton failed to evaluate all the information available concerning the related party transactions, to determine whether they were adequately disclosed, in accordance with SFAS 57, in the financial statements. See AU § 334.11.

158.   Grant Thornton ignored that "evidence of significant or extensive undisclosed related party transactions" is indicative of a significant deficiency in the design or operation of internal control that could adversely affect Xybernaut's "ability to record process, summarize, and report financial data consistent with the assertions of management in the financial statements." AU § 325.21.

159.   The Securities and Exchange Commission (SEC) requires registrants to have their financial statements audited by a firm of independent accountants as a condition for the inclusion of those finical statements in fillings made under the Securities Act of 1933 and the Securities Exchange Act of 1934. In a speech given in September of 1998, Securities and Exchange Chairman Arthur Levitt stated "I don't think it should surprise

anyone here that recent headlines of accounting failures have led some people to question the thoroughness of audits. I need not remind auditors they are the public's watchdog in the financial reporting process. We rely on auditors to put something like the good housekeeping seal of approval on the information investors receive. The integrity of that information must take priory over a desire for cost efficiencies or competitive advantage in the audit process. High quality auditing requires well-trained, well-focused and well supervised auditors."

160.    Grant Thornton is one of the largest international firms of certified public accountants.    Grant Thornton was engaged by Xybernaut to provide auditing and accounting services as well as tax and consulting services throughout the Class Period. Grant Thornton was the auditor of Xybernaut's financial statements for each of the years ended 2002 and 2003. In addition, it is believed that Grant Thornton performed reviews of the quarterly financial statements of Xybernaut throughout the same period.    Grant Thornton audited Xybernaut's 2002 and 2003 financial statements and issued its audit opinion stating that Xybernaut's financial statements for the years ended December 31, 2002 and 2003 were fairly presented in accordance with GAAP and that he audited those financial statements in accordance with GAAS. **Those statements were false**. Grant Thornton was aware of facts that undeniably precluded it from making any of those statements at the time they were made. Xybernaut's financial statements and Grant Thornton's opinions on them were then used by Xybernaut with Grant Thornton's consent to publicly disseminate its 2002 and 2003 financial results in the filing of its annual Form 10-K with the SEC.

161.    Grant Thornton willingly and knowingly violated its public watchdog role and

the requirement to comply with GAAS as Xybernaut's independent accountants in order to assist its client in maintaining its ruse with respect to its financial viability. Grant Thornton issued unqualified opinions in 2002 and 2003 stating that the financial statements of Xybernaut were fairly presented in accordance with GAAP when Grant Thornton knew of facts and circumstances that undermined such unqualified opinion and rendered them false and misleading.

162.    Grant Thornton willingly and knowingly violated his public watchdog role and the requirement to comply with GAAS as Xybernaut's independent accountants in order to assist its client in maintaining its ruse with respect to its financial viability.

163.    Grant Thornton was required to evaluate internal controls in connection with the audit of the consolidated financial statements for each for the years ended December 31, 2002 and 2003. The ability of senior management to override the system of internal controls as demonstrated in 2002 and 2003, due to the announced findings of non-reliance on these financial statements and the need for eventual restatement, could not have existed but for the wanton failure of Grant Thornton to properly evaluate internal controls as required by GAAS and to properly monitor Xybernaut's compliance with Section 13 of the Securities Exchange Act. These failures allowed management to perpetuate fraud in the reporting of quarterly results and the ability to perform illegal acts that went undetected for a period of one year.

164.    As indicated above, Grant Thornton chose to disregard their professional responsibility to require Xybernaut to adjust its financial statements or alternatively for Grant Thornton to qualify its opinion regarding the fairness of presentation of those financial statements in accordance with GAAP. Grant Thornton, one of the largest

international accounting firms, literally looked the other way when Xybernaut repeatedly violated GAAP -- and issued false financial statements for the purpose of allowing Xybernaut's securities to continue to trade, attracting additional investor funds.

165.    Grant Thornton was a primary participant in this scheme because it failed to comply with GAAS and the securities laws as follows:

     (A)    In the course of performing its audit services, Grant Thornton obtained evidential matter revealing the adverse facts detailed above about Xybernaut's business and finances, but improperly failed to require Xybernaut to adjust its financial statements or make disclosure of such facts. As a result of its investigations and audit work, Grant Thornton knew that the reports and financial statements described herein were materially misleading or it recklessly disregarded facts that showed that all such statements were materially misleading.

     (B)    Grant Thornton failed to require Xybernaut to disclose material adverse facts and allowed the Company to make material misrepresentations to its shareholders and to the investing public during the Class Period.

     (C)    Grant Thornton violated GAAS General Standard No. 3 that requires that due professional care must be exercised by the auditor in performance of the examination and the preparation of the audit report;

     (D)    Grant Thornton violated GAAS Standard of Field Work No. 2 that

requires the auditor to make a proper study of existing internal controls, to determine whether reliance thereon was justified, and if such controls are not reliable, to expand the nature and scope of the auditing procedures to be applied. Grant Thornton knowing that the Company's internal controls were insufficient, failed to expand its auditing procedures.

(E)    Grant Thornton violated GAAS Standard of Reporting No. 1 that requires the audit report to state whether the financial statements are presented in accordance with GAAP. Grant Thornton's opinion inappropriately represented that Xybernaut's financial statements complied with GAAP, when Grant Thornton knew or recklessly disregarded that they did not for the reasons herein alleged.

(F)    Grant Thornton violated GAAS Standard of Reporting No. 4 that requires, when an opinion on the financial statements as whole cannot be expressed, that the reasons be stated. Grant Thornton should have either stated that no opinion could be issued by it on Xybernaut's financial statements were not fairly presented.

166.    As a result of the foregoing, Grant Thornton's certification of Xybernaut's 2002 and 2003 financial statements falsely represented that the statements were audited pursuant to GAAS, and that Xybernaut's financial statements were presented in conformity with GAAP. Grant Thornton knew that such certification was false and misleading because: (i) Grant Thornton knew or was reckless in not knowing that the Company's financial statements violated GAAP; and (ii) Grant Thornton knew it had not complied with GAAS.

167.    As a result of the services rendered to Xybernaut, Grant Thornton's personnel were present at Xybernaut's corporate headquarters and examined or participated in reviews, investigations and audit procedures regarding Xybernaut's financial condition, business operations and financial, accounting and management-control systems. In the course of performing such services, Grant Thornton had unlimited access to substantial evidential matter revealing the adverse facts about Xybernaut's business and finances, but improperly failed to require adjustment for or disclosure of such facts.

168.    Defendant Grant Thornton: (a) knew or was reckless in not knowing of the material, adverse, non-public information about Xybernaut's financial results and then-existing business conditions, which was not disclosed; and (b) participated in drafting, reviewing, and/or approving the misleading statements, releases, reports, and other public representations of and about Xybernaut.

169.    During the Class Period, Grant Thornton disseminated or approved the false statements made by the Individual Defendants, which it knew were misleading in that they contained misrepresentations and failed to disclosed material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

170.    Defendant Grant Thornton violated §10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 in that it:

     (A)    Employed devices, schemes, and artifices to defraud;

     (B)    Made untrue statements of material facts or omitted to state material facts necessary in order to make statements made, in light of the circumstances under which they were made, not misleading; or

(C)    Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon plaintiffs and others similarly situated in connection with their purchases of Xybernaut securities during the Class Period

171.    The undisclosed adverse information concealed by Grant Thornton during the Class Period is the type of information which because of SEC regulations, regulations of the national stock exchanges and customary business practice, is expected by investors and securities analysts to be disclosed and is known by corporate officials and their legal and financial advisors to be the type of information which is expected to be and must be disclosed. For example:

(A)    Under Item 303 of Regulations S-K, promulgated by the SEC under the Exchange Act, there is a duty to disclose in periodic reports filed with the SEC "known trends or any known demands, commitments, events or uncertainties" that are reasonably likely to have a material impact on a company's sales revenues, income or liquidity, or cause previously reported financial information not to be indicative of future operating results. 17 C.F.R. §229.303 (a) (1) - (3) and Instruction 3. In addition to the periodic reports required under the Exchange Act, management of a public company has a duty promptly "to make full and prompt announcements of material facts regarding the company's financial condition." SEC Release No, 34-8995, 3 Fed. Sec. L. Rep. (CCH) ¶23,120A, at 17,095, 17 C.F.R. §241.8995 (10/15170). The SEC has repeatedly stated that the anti-fraud

provisions of the federal securities laws, which are intended to ensure that the investing public is provided with "complete and accurate information about companies whose securities are publicly traded," apply to all public statements by persons speaking on behalf of publicly traded companies "that can reasonably be expected to reach investors and the trading markets, whoever the intended primary audience." SEC Release No. 33-6504, 3 Fed. Sec. L. Rep. (CCH) ¶23,120B, at 17,096, 17 C.F.R. §241.20560 (1113/84). The SEC has emphasized that "[i]nvestors have legitimate expectations that public companies are making, and will continue to make, prompt disclosure of significant corporate developments." *Sharon Steel Corp.,* SEC Release No. 18271, [1981-1982 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶83,049, at 84,618 (11119181); and

(B)    Schedule D of the National Association of Securities Dealers ("NASD") Manual, which governs companies whose securities are included in the NASDAQ company to "make prompt disclosure to the public through the press of any material information that may affect the value of its securities or influence investors' decisions." NASD Manual, Schedule D, Part II §(c)(13) [11903 (c)(13)].

172.    Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Xybernaut securities. Plaintiffs and the Class would not have purchased Xybernaut Securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by

Grant Thornton's misleading statements.

**WHEREFORE,** Plaintiff prays for relief and judgment, as follows:

1.      Determining that this action is a proper class action and appointing Plaintiff as Lead Plaintiff and their counsel as Lead Counsel for the Class and certifying them as class representatives under Rule 23 of the Federal Rules of Civil Procedure;

2.      Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

3.      Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

4.      Awarding Plaintiff and other members of the Class such other and further relief as the Court may deem just and proper.

### JURY TRIAL DEMANDED

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff hereby demands a trial by jury in this action for all claims against all defendants.

ROSENTHAL, MONHAIT, GROSS
& GODDESS, P.A.

Jessica Zeldin (Del. Bar No. 3558)
Suite 1401, 919 North Market Street
P.O. Box 1070
Wilmington, Delaware 19899-1070
jzeldin@rmgglaw.com
(302) 656-4433
Attorneys for Plaintiff

OF COUNSEL:

William B. Federman, OBA # 2853
Wm. Pat Wasson, OBA #19266
FEDERMAN & SHERWOOD
120 N. Robinson, Suite 2720
Oklahoma City, OK 73102
(405) 235-1560

June 2, 2005

**Plaintiff's Certification of Investment of**
**Xybernaut Corporation [Nasdaq: XYBR.PK]**

I, _Charles W. Smith_, hereby certify that the following is true and correct to the best of my knowledge, information and belief:

1.      I have reviewed the Complaint in this action and authorize the filing of this Certification.

2.      I am willing to serve as a representative party on behalf of the class (the "Class") as defined in the Complaint, including providing testimony at deposition and trial if necessary. I am willing to participate on an executive committee of shareholders.

3.      Plaintiff's transaction in Xybernaut Corporation security that is the subject of this action is:

| Purchased | Date | Price |
|-----------|------|-------|
| 10,000 | 3/9/04 | 1.62 |
| 7,000 | 3/11/04 | 1.38 |
| 5,000 | 10/27/04 | 1.05 |
| 350 | 01/13/05 | 1.14 |

4.      I did not purchase these securities at the direction of my counsel, or in order to participate in a lawsuit under the Securities Exchange Act of 1934.

5.      During the three-year period preceding the date of the Certification, I have not sought to serve, nor have I served, as a representative to any party or on behalf of any class in any action arising under the Securities Exchange Act of 1934.

6.      I will not accept any payment if chosen to serve as a representative party on behalf of the Class beyond my pro rata share of an award to the Class, or as otherwise ordered and approved by the Court.

Signed under penalty of perjury, this _21_ day of _May_, 2005.

_Charles W. Smith_
**Signature**

_CHARLES W. SMITH_
**Name    (please print)**

**Telephone Number**

Return to:
William B. Federman
FEDERMAN & SHERWOOD
120 N. Robinson, Suite 2720
Oklahoma City, OK 73102
(405) 235-1560/Fax (405) 239-2112
Email: wfederman@aol.com
Website: www.federmanlaw.com

I:\Pending\Xybernaut\InvestCert.doc